GARRISON, The W. F. See Case No. 17,-475.

## Case No. 5,257.

### GARROW et al. v. DAVIS et al.

[10 N. Y. Leg. Obs. 225.]

Circuit Court, D. Maine. Sept. Term, 1851.[1]

#### PRINCIPAL AND AGENT.

1. An agent, when contracting for his principal, cannot stipulate for any private collateral benefit for himself. If he does, he will be deemed to take and hold it in trust for his principal. The rule applies to all persons standing in a fiduciary relation to those for whom they are acting.

[See note at end of case.]

2. Fraud may be inferred from facts and circumstances without direct proof. But when the circumstances admit of a natural and probable explanation, consistently with the innocence and good faith of the party charged with the fraud, the presumption is in favor of innocence.

[See note at end of case.]

3. A simple hope, expectation, or possibility of benefit is a sufficient consideration to support the contract of sale.

[This was a bill in equity by John Garrow, Thomas Y. How, Jr., James Seymour, and George Miller against Amos Davis, George M. Pickering, William McCrillis, and Ephraim Paulk.]

WARE, District Judge. In February, 1835, John Black, as the agent of the devisees of William Bingham, entered into two contracts with one Ramsdell to sell to him a township of land, No. 14, in the county of Hancock, with a strip adjoining it, amounting in the whole to 28,804 acres, at three dollars per acre, the whole amount of the purchase being $86,412, to be paid in five equal installments, the first in sixty days, and the others in one, two, three, and four years, with interest, for which notes were given. The contract contained a proviso that if the notes were not paid according to their tenor, at the election of the vendor the contracts might be declared void, and the money paid should be forfeited. On the 1st of April, 1835, Ramsdell assigned

[1] [Affirmed in 15 How. (56 U. S.) 272.]

all his interest in both contracts to Nathaniel Norton and Junius Keith, and by several mesne assignments, two-thirds of the interest in the contracts came to the plaintiffs by purchase at different times between 1837 and 1841. The first notes for one-fifth of the purchase money were paid at maturity or within a few days after, and Black received at different times afterwards from the different assignees, on account of the contracts, including the first payment, $34,-005.24. He also received for timber taken from the land, $6,066.46, amounting, with the cash payments, to $40,071.70, leaving $46,341.30 due on the contracts, inclusive of interest. In 1839, there was some negotiations with Black for an arrangement by some of the parties interested in the bonds by which they might obtain the means of paying for the land by a sale of the timber, but the negotiation failed, and nothing further was done till 1844, when Black, July 22, wrote to Miller, one of the plaintiffs, saying that he had heard nothing for several years from the parties, and informing him that he had applications for the purchase of the land, and inquiring what the holders of the bonds intended to do in regard to their interests in them. The plaintiffs wishing to save something for themselves, and not being in a condition, or not desirous of purchasing the land, employed Paulk, one of the defendants, to sell their rights and interest in the contract. All their legal rights had become forfeited, or were liable at the election of the vendor to be forfeited, under the proviso, by the non-payment of the purchase money, but as Black had given them no notice of his intention to insist on the forfeiture, it was supposed that their rights in equity were not entirely foreclosed. These were a right to complete the purchase by paying what was due on the notes. But since the original contract, the market value of timber lands had so fallen that this tract, which was bargained for in 1835 at three dollars an acre, was now considered to be worth but about one, and the balance remaining due on the contract, inclusive of the accumulation of interest, was more than the present market value of the land. All that Paulk had for sale was, therefore, the good will of the contract; that is, the hope or expectation that the vendor would be willing to sell to them, as the assignees of Ramsdell, in consideration of what they had already paid, at a lower price than he would demand of strangers. It appears from the deposition of Black that though he held the bonds to be entirely forfeited and of no value, he was unwilling to sell to others until the bonds were surrendered and canceled, and it was evidently considered by others as well as the plaintiffs, that the possession of the contract was worth something in making a bargain with him. Miller first applied to Paulk by letters, on the 11th and 13th of September, requesting him to make inquiries and

ascertain whether anything could be saved to the parties interested in the contracts by a sale of them, and expressing a faint hope that the land might be worth something more than the balance remaining due. Paulk in his answer communicated the information that he had obtained, and expressed his opinion that the land was not worth in the market more than one dollar per acre, which was considerably less than the balance due on the note without interest, and that there was little prospect of the holders of the bonds saving anything, unless Black could be induced to make in their favor a considerable abatement of the price. In the last of October, Paulk was regularly authorized by Miller and Norton, two of the plaintiffs, to transfer their interest, and furnished with the original contract to be surrendered to Black. Under this authority he sold the interest of Miller and Norton to Davis, one of the defendants, for $1,050, November 16th. There was a stipulation in the contract of sale that the purchaser should have the benefit of the vendor's communication with Black in regard to the price of the land, and that Paulk should continue the negotiation with him for Davis' benefit. Davis soon after sold portions of his purchase to the other defendants. It is also alleged in the bill that it was understood that Paulk should act on the behalf of all the parties interested in the bonds, although he was formally authorized only by two of them. The plaintiffs complain and charge in their bill that Paulk entered into a corrupt and fraudulent agreement with the other defendants, to procure for their common advantage an assignment of these contracts from the plaintiffs for an inadequate and trifling consideration, and then to continue to negotiate in their names with Black, so that he might be made to believe that whatever abatement he might make in the price would enure to the benefit of the plaintiffs; and it alleged that it was well known that Black, from considerations of equity and favor, was willing to sell to them, and did actually sell under the belief that it was for their benefit, for a much less sum than he could have obtained from other persons. The prayer of the bill is that the defendants may be held as trustees and decreed to assign to the plaintiffs all the right and interest they obtained by virtue of the sale by Black on the payment of such sum as they have paid, and to account for whatever they have received from the sale of timber or otherwise from the land.

Such in substance is the case presented by the plaintiffs' bill. It is not pretended that they were desirous of becoming purchasers of the land at the time when Paulk made his contract with Davis, and all that they can equitably demand is to have the benefit of any abatement of the price which from any consideration he might be willing to make, and did actually make, from what he would have demanded and might have ob-

tained from strangers, or whatever other value the bonds might have. There is a variety of matter introduced into the bill in giving a history of the transaction relative to the land from the first contract with Ramsdell to the final sale to Davis, sharing the hardships and losses to which the plaintiffs have been subjected, constituting a strong appeal to the sympathy and favor of Black, if from his position of an agent, and not an owner, he could be supposed to be accessible to any consideration of this kind, and there are various charges against Paulk with regard to his management of the business, which have an application more or less direct and stringent on the question of his good faith in the conduct of his negotiations; but the gravamen of the bill is that which I have stated.

A material question arises, then, whether Black was willing to sell, and actually did sell, under a belief that he was doing a favor to the holders of the bonds, for a less sum than he would have demanded of other persons. The answers of Col. Black to this point are perfectly conclusive. He says that he did not consider them as having any legal or equitable claim against him or his principals arising out of the original contract, and that he never intended to make them any allowance or consideration for any such supposed claim further than an offer of a renewal of the bonds or right of pre-emption; that he had, as agent of the trustees of the estate, always given bonds in the same form as those given to Ramsdell, that many had been forfeited by neglect to make the payments, and that he had considered such bonds as worthless; that it was his wish to have them returned before giving new ones, but that he had often given new bonds without the surrendering of the old, but that his custom was to notify the holders and give them, as a matter of comity and not of right, a privilege of pre-emption, provided they would give as much as others, and that in this case, as in others, he considered it as his duty to sell for the best price he could get. It is therefore certain that the supposition on which the suit seems to have been originally commenced was a mistake, and when these bonds were offered for sale all the value they had was that they gave a simple right or privilege of pre-emption, and furnished no basis of a claim for a reduction of the price below the market value of the land. But this right is admitted to have been worth something, and the question of interest to the plaintiffs is whether Paulk in good faith endeavored to obtain, and did obtain, the best price he could. Immediately after receiving the first letters, he made inquiries for the purpose of finding a purchaser. He had an offer of $1,000 from Dwinal, which he did not think proper to accept, and attempted to make arrangements with Vickering, but, failing of success, he finally sold to Davis, who had before been in negotiation with Black for the purchase of the land, for $1,050. No evidence is offered tending to prove that a higher price could have been obtained, and none that shows that the right of pre-emption was worth a greater sum. So far as the evidence goes, it shows that Davis, after paying the bond holders for the bonds, paid Black the fair market value of the land. Such is the direct testimony of Dwinal, and such seems evidently to be the opinion of Roberts,—two of the plaintiff's witnesses, both well acquainted with the value of timber lands. I have not been able to find in the record any evidence of a want of diligence and fidelity in Paulk in his endeavors to find a purchaser, or any proof that the sale was actually below the value of the bonds; nor any evidence of collusion with Davis or others in the negotiation for the sale.

Some discrepancies urged at the argument between Paulk's answer and the proofs do not appear to me to be of sufficient importance to warrant the imputation of bad faith. They principally are this, that Paulk urged haste in closing the contract; and it is argued that he wished to prevent Miller from visiting Bangor for the purpose of negotiating himself. But it is to be borne in mind that the sale was not concluded until the near approach of the lumbering season, and if it were delayed, the opportunity for a sale that season would be lost, and with it possibly the chance of obtaining anything for the bonds. The contract of sale was completed, and the papers executed, November 16, but as Davis was not prepared to pay the money, they were deposited in a bank. Miller was informed of the contract, was dissatisfied, and wrote to Paulk to delay the sale until he could go to Bangor, and Miller had delayed the delivery of the papers to the 25th of November to allow Miller time for that purpose, and that he might ratify or disaffirm the contract, but he not arriving, the papers were delivered on the 26th. Complaint was also made that the suggestion of Dwinal was not adopted, and the bond sold at auction. In this case the offer would of course be withdrawn, and it is possible that at an auction sale the bonds would have brought less than the offer, and there was no considerable probability that an advance would be obtained. It was a proposition on which the agent ought to exercise a sound discretion, and his not adopting it seems to me but a slight foundation for an imputation of bad faith. Though there may be something in the conduct of Paulk which may, to a suspicious mind, appear equivocal, there is nothing that appears to me to warrant the charge of collusion with Davis to pass into his hands the bonds at an under price. And it is certain that Davis, so far from thinking that Paulk had any disposition to favor him in the bargain, complained of his want of frankness in the negotiation.

It was earnestly contended by the counsel for the plaintiffs that the contract of Paulk with Davis was absolutely void in itself. In that contract, Paulk, speaking for his principals, says: "We also agree that the

said Davis may have the benefit of all our communications with Col. Black, as regards the price of the land, and may continue the negotiations with Col. Black through our authorized agent for the said Davis' benefit, said Davis paying said agent for what he may do hereafter, and ourselves not being in any way liable for his acts while negotiating for said Davis." It is contended that this term of the contract per se rendered it void—First, because by this clause he became in the same transaction the agent of the buyer as well as the seller; and, secondly, because he has introduced into the contract a condition for his own private and personal benefit. It is certain that an agent to sell cannot make himself an agent for the buyer. If he presumes to act as such, it is admitted that the contract of sale will be void, at the election of the vendor. But it is not precisely true that Paulk, by virtue of this condition, was the agent of the buyer at the time when the contract was made. He became so by virtue of the contract, but not until it was completed, and then his agency for the seller terminated. The objection, therefore, does not apply in technical strictness. If the contract may be declared void on the ground of this condition, or if the condition show to the plaintiffs a way for any other equitable relief, it must be for the second reason urged by the counsel,— that it is a stipulation for the private benefit of the agent.

It is a general rule of law that an agent shall not be allowed, when contracting for his principal, to provide for himself any emolument in pecuniary advantage from the contract, beyond the compensation which he receives from his employer. An agent to sell cannot be a buyer, or be in any way interested in the purchase of what he sells. Nor can he, when contracting for his principal, stipulate for any individual or collateral advantage to himself. If he does, he is deemed to take and hold it as a trustee for his principal. It is a rule which applies to all persons standing in a fiduciary relation to the parties for whom they are acting, founded in a wise public policy, and which courts of equity are in the habit of enforcing with wholesome rigor. The most entire good faith is a legal obligation. If it were otherwise, an agent would be under the temptation of sacrificing the interest of his principal for some collateral benefit to himself, and the law therefore wisely closes the door against the temptation, and holds that all such benefits of a pecuniary value which the agent may make in his own interest shall enure for the benefit of his principal. 1 Story, Eq. Jur. pp. 308, 315, 320; 4 Kent. Comm. 432, and notes; Story, Ag. p. 211. Of the general rule there is no question. If a servant or an agent, availing himself of the advantage of his relation to his employer, gains by a bargain a profit to himself beyond the proper remuneration belonging to his office or employment, he must account for it. Thus, if a factor, employed to purchase for his principal, instead of taking his commission or a factorage, charges a mercantile profit, such as he would in the sale of his own goods, or in fact executes his commission by a sale of his own goods for such an advance on the price, he will be held to refund to his principal all beyond his proper commission. East India Co. v. Henchman, 1 Ves. Jr. 289; Massey v. Davis, 2 Ves. Jr. 319; Lonsdale v. Church, 3 Brown, Ch. 41. The only question of difficulty is whether the facts bring the present case within the rule. If this term of the contract had been introduced by Paulk in his own interest, and for the purpose of giving him the profit of a second agency, it would seem to fall within the reason of the rule. It would at least have the appearance of being part of the consideration of the transfer of the bonds. But the owners are entitled to the whole of this consideration, in whatever form may be given to it, and this stipulation might render the contract void or entitle the plaintiff to an account of the profits he made in his agency. Story, Ag. p. 207. It becomes, then, important to inquire what was the true reason for the insertion of this condition in the contract of the sale of the bonds. It is charged in the bill that Black was willing to sell to the plaintiffs for a much less sum than he would have demanded, and could have obtained, from others, and that Paulk entered into a fraudulent agreement with the other defendants to sell the bonds for a trifling and nominal price, and then to continue the negotiation, ostensibly for the plaintiffs, and then obtain the benefit of this reduction of the price for the defendants, and that for this he was to receive a large interest in the land, or a large sum of money; and the argument is that this sum of $1,500 was paid to him for the betrayal of his trust.

It is seen by the testimony of Black that the expectation that he would make any abatement of the price in favor of the assignees of the bonds was a delusion. But this notion appears to have been entertained by others as well as the plaintiffs; at least by Davis. It cannot, I think, be fairly denied that one reason for introducing this condition into the contract was that Davis might obtain the benefit of any favor in the terms of the sale that Black would be willing to allow the plaintiffs in consideration of the losses they had sustained in their former contract. This was a chance or hope that they might fairly sell, for it had cost them a large sum. An expectation or a hope, if it has an appreciable value, is a sufficient consideration to support the contract of sale. Poth. Vente, No. 6; Spei emptio est, Dig. 17, 1–8. Did, then, Paulk, in the sale of the bonds to Davis obtain in the price the value or the benefit of this hope or expectation? In his answer to this charge of the bill, he says that this was

the stipulation of Davis, that the offer of $1,050 was on this express condition; a condition which he says that he considered that he had a right to agree to. Davis, also, in his answer, says that he made this a condition in his offer, that he might have the advantage of all those considerations of equity or favor which the vendor could be induced to extend to the previous holders of the bonds. These answers, being responsive to the bill, must be taken as true unless overcome by other evidence. But there is no direct evidence in the case to control the effect of the answers; nor is there anything in the circumstances connected with the transaction that impairs their credibility beyond the stipulation, on the face of the contract, and the sum ultimately paid to Paulk for his services. But a contract of sale by an agent containing a condition apparently for his private benefit will naturally be scrutinized with jealousy, especially when, as pointedly urged by the counsel, he indirectly obtains for himself more than he does for his principal. Whatever fair pretexts may be thrown over the transaction, it will be the duty of the court to look into it with great care, and be satisfied that they are not mere pretexts to cover a secret and fraudulent collusion between the agent and the other party. If this fact stood alone and unexplained, it would give strong color to the charge of collusion. But it is to be observed that the contract of sale provided only that the purchaser should have the advantage of Paulk's previous negotiations with Black, and should continue them at the expense of Davis, without determining the amount of the compensation. That was to be fixed by Vickering, who at this time certainly had no interest in the bargain. Now if there was foundation for the opinion that Black would make an abatement from the price in favor of the plaintiffs, that advantage, it was supposed, could only be obtained by continuing the negotiation nominally for them. The compensation of $1,500 was awarded by Vickering, not merely for his personal services and time in negotiating the bargain, but included his compensation for endorsing Davis' notes. These amounted to $30,000, and even if the whole was considered as commission it would not be a very extravagant commission, considering the length of time the notes had to run, and that Davis was a man of doubtful credit. But then it is said that Paulk himself was insolvent, and that if his endorsement was of slight value to the holders of the notes, his liability was of nearly as little consequence to himself; and that it is not reasonable to suppose that if $1,500 would be paid for the endorsement of an insolvent person. But in answer it may be said that Black absolutely insisted on an endorser; that it was his invariable practice in all sales of lands; that he was willing to take Paulk; and that Davis could obtain no other. The other parties who were then negotiating for an interest,

and eventually became interested in the purchase, refused, on any consideration, to endorse the notes, and preferred to pay the sum fixed by Vickering rather than take this responsibility on themselves.

These circumstances appear to me sufficiently to account for the introduction of this condition into the contract without supposing that Paulk sacrificed the interest of his employer for a collateral benefit to himself. Fraud is never presumed, nor ought it to be imputed on mere suspicion. It must be shown by clear proof. "Dolum in indiciis perspicuum probari convenit." Code, 2, 21, 6. It may be inferred from facts and circumstances. Domat. liv. 1, tit. 18, § 3, No. 4. But when these facts are susceptible of a natural and probable explanation consistently with the good faith and honesty of the parties, it is sufficient to say that they do not prove fraud, and the legal conclusion then is in favor of innocence. I am the better satisfied with this conclusion, as I think it appears from the testimony that Paulk obtained by the sale of the bonds all that the possession of them at the time of the sale was believed to be worth. My opinion on the whole is that the bill ought to be dismissed, with costs.

[NOTE. On complainants' appeal this decree was affirmed by the supreme court. Mr. Justice Curtis, in delivering the opinion, reviewed the evidence in detail, and held that it did not show that the complainants' agent disposed of what he was employed to sell for less than its value and that he did it fraudulently. In respect to the two defendants McCrillis and Pickering, it was noted that there was no evidence tending to show they were guilty of any fraud. Upon the charges of fraud in respect to the other defendants, and the answers denying those charges, and the proofs, the court was of the opinion that the complainants failed to make out a fraudulent combination between Paulk and Davis, and hence the decree of the circuit court dismissing the bill was duly affirmed. 15 How. (56 U. S.) 272.]